## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RICKY KOCH, ET AL.,**                                    **CIVIL ACTION**
    **Plaintiffs**


**VERSUS**                                                **NO. 13-205**


**UNITED STATES OF AMERICA,**                             **SECTION: "E" (2)**
    **Defendant**


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a third-party negligence action under Section 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA").   Ricky Koch alleges he sustained personal injury while descending a dimly lit stairwell aboard a vessel owned by the United States.   The questions presented are whether the United States was negligent, and, if so, whether this negligence was the legal cause of Mr. Koch's injuries.[1]

This case was tried before the undersigned without a jury.   Having considered the evidence admitted at trial and the arguments of counsel, the Court announces its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such.   To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

---

[1] American Interstate Insurance Company ("AIIC") has filed a complaint in intervention.   AIIC issued a policy of workers' compensation coverage to Ricky Koch's employer.   Pursuant to this policy, AIIC has paid benefits to Mr. Koch.   AIIC seeks a lien on Mr. Koch's recovery in this suit to the extent of compensation benefits already paid.

## FINDINGS OF FACT

1. The S.S. ALTAIR and S.S. BELLATRIX are public vessels owned by the Maritime Administration of the United States Department of Transportation.   Tote Services, Inc. ("Tote") operates and crews both vessels.

2. For purposes of this opinion, Tote acted as an agent of the United States.

3. On January 27, 2012, Tote issued requests for quotation to Economy Iron Works, Inc. ("Economy Iron") and other contractors for repair work on the S.S. ALTAIR and S.S. BELLATRIX.

4. Economy Iron formerly employed Mr. Koch as a foreman.

5. Mr. Koch is a 56-year-old male.

6. On the morning of February 2, 2012, Mr. Koch boarded the S.S. ALTAIR on behalf of Economy Iron to submit bids on areas of the vessel in need of repair.[2] There were six other contractors present.

7. The vessel's Chief Engineer—Thomas Ostarly ("Ostarly")—led the contractors on a "walkthrough" of the vessel.

8. After inspecting various areas on the vessel, the parties arrived at the lower forward constant tension winch room (the "Winch Room").

9. The Winch Room is a small compartment that houses the vessel's eductor system.

10. In order to access the Winch Room, the parties had to descend a stairwell.

11. Ostarly flipped a light switch at the stop of the stairwell, but the fluorescent lights did not fully illuminate.

12. Ostarly led the contractors down the stairwell, which got progressively darker as the descent continued.

---

[2] At this time, the S.S. ALTAIR was in Reduced Operating Status and docked in Marrero, Louisiana.

13. Each contractor had a flashlight.

14. Some contractors used the flashlight during the descent.

15. Mr. Koch did not use a flashlight, choosing instead to use both hands to hold handrails on opposite sides of the stairwell.

16. Mr. Koch was one of the last contractors to descend the stairwell.

17. Towards the bottom of the stairwell, the handrails ended, and Mr. Koch thought he had reached the deck.  Due to the inadequate lighting, Mr. Koch could not see there was an additional step painted yellow.

18. Mr. Koch unexpectedly reached this step and his legs "crunched."  Mr. Koch then lurched backwards and struck the bulkhead or some other piping behind him.

19. Mr. Koch cried out in pain.

20. He immediately felt extreme discomfort in his knees, neck, and back.

21. Mr. Koch sat on the stairwell while the other contractors inspected the Winch Room.

22. Mr. Koch left the Winch Room with the other contractors.  He informed two of the contractors—Robbie Dendinger and Scott Fassler—of the accident.

23. Despite this accident, Mr. Koch continued on the walkthrough.

24. The walkthrough proceeded to the S.S. BELLATRIX, which was moored alongside the S.S. ALTAIR.

25. Mr. Koch informed the S.S BELLATRIX's Chief Engineer, Joseph Kibodeaux, of his accident.

26. Mr. Koch did not complete the walkthrough on the S.S. BELLATRIX and returned to his office at Economy Iron at approximately 1:00 p.m.

27. After completing an accident report, Mr. Koch remained in the office for the rest of the workday until a colleague drove him home.

28. Mr. Koch arrived at his home in extreme pain.  Mr. Koch's wife, Plaintiff Susan Koch, returned home from work and discovered her husband immobile on a recliner.  Mr. Koch informed Mrs. Koch of his accident at work.

29. Mr. Koch's subsequent medical treatment was extensive.

30. On February 7, 2012, Mr. Koch visited Doctor's Urgent Care in Slidell, Louisiana and was diagnosed with multiple arthralgia and degenerative joint disease.  Dr. Charles Preston instructed Mr. Koch to follow up with his doctors in one to two weeks.

31.  On February 17, 2012, Mr. Koch visited Elite Orthopaedic Specialists.  He was treated by Dr. Simon Finger, an orthopedic surgeon.

32. After reviewing Mr. Koch's medical history, obtaining x-rays of his knees, and performing a physical examination, Dr. Finger diagnosed Mr. Koch with osteoarthritis of both knees.   Dr. Finger recommended bilateral knee replacements.  Following these replacements, Dr. Finger believes Mr. Koch will eventually require revision surgery of both knees.

33. Dr. Finger believes the exacerbation of Mr. Koch's osteoarthritis, the need for bilateral knee replacements, and the eventual need for revision surgeries are causally related to the accident on February 2, 2012.

34. On April 11, 2012, Mr. Koch visited Dr. Lucien Miranne, a neurosurgeon who previously performed an anterior cervical discectomy and fusion ("ACDF") on Mr. Koch at C3-4 and C4-5 in 2008.

35. Dr. Miranne ordered MRI and x-ray imaging of Mr. Koch's cervical spine.

36. Mr. Koch returned to Dr. Miranne on May 16, 2012.

37. Dr. Miranne reviewed the latest images and conducted a physical examination.

38. Dr. Miranne concluded that as a result of the accident on February 2, 2012, Mr. Koch herniated a previously degenerative disc at C6-7 and exhibited increased symptomology from a pre-existing spinal spondylosis at C5-6.

39. Dr. Miranne recommended an ACDF at C5-6 and C6-7.

40. Dr. Miranne performed the ACDF at C5-6 and C6-7 on August 17, 2012.

41. Mr. Koch returned to Dr. Miranne for several post-operative visits.  Mr. Koch reported that his symptoms worsened after the surgery and that he experienced severe pain in his neck, shoulders, arms, and hands.

42. Dr. Miranne recommended a right carpal tunnel release surgery, which he performed on April 30, 2013.

43. Mr. Koch returned to Dr. Miranne for a post-operative visit on May 15, 2013. While the right carpal tunnel had improved, the left carpal tunnel had worsened.

44. Dr. Miranne recommended a left carpal tunnel release.

45. Dr. Miranne had not yet performed the left carpal tunnel release at the time of trial.

46. Dr. Miranne believes Mr. Koch's carpal tunnel problems are causally related to the accident on February 2, 2012 and/or the August 17, 2012 ACDF.[3]

47. Mr. Koch's symptoms continued to worsen.

48. Following review of a cervical MRI and a physical examination on October 30, 2013, Dr. Miranne recommended a posterior decompression at C5-6 and C6-7,

---

[3] As explained more fully below, the August 17, 2012 ACDF is causally related to the February 2, 2012 accident.

with foraminotomies at C5-6 and C6-7 bilaterally, and then "lateral fusion with lateral mass screws and rods and bone grafting."[4]

49. Dr. Miranne believes this surgery was necessitated by the accident on February 2, 2012 and/or the August 17, 2012 ACDF.[5]

50. Dr. Miranne had not yet performed the posterior decompression and lateral fusion surgery at the time of trial. He recommended Mr. Koch first undergo the bilateral knee replacements recommended by Dr. Finger.

51. On July 14, 2014, Dr. Finger performed a right total knee replacement.

52. At the time of trial, a left total knee replacement was scheduled for January 2015.

53. At some point after this lawsuit was filed, Dr. William Hagemann—the Government's expert witness—performed an independent medical evaluation of Mr. Koch.

54. Dr. Hagemann physically examined Mr. Koch, took x-rays, and reviewed *some* of Mr. Koch's medical records.[6]

55. On the basis of this information, Dr. Hagemann testified the injuries of which Mr. Koch complains were not caused by a recent traumatic event but instead resulted from pre-existing conditions. Dr. Hagemann testified the accident caused, at most, a "temporary exacerbation" of Mr. Koch's symptoms.

56. The Court finds Dr. Hagemann's opinions are not credible for several reasons. First, Dr. Hagemann's review of Mr. Koch's medical history was woefully incomplete. Second, Dr. Hagemann conceded Dr. Miranne was in a better position than he to opine on the condition of Mr. Koch's spine before and after

---

[4] Trial Ex. 75.
[5] *See supra* note 3.
[6] It became clear during cross-examination that Dr. Hagemann did not review a complete set of Mr. Koch's medical records.

the accident.  Third, Dr. Hagemann's opinions are inconsistent with the credible opinions of Mr. Koch's treating physicians—Dr. Finger and Dr. Miranne.

57. As a result of the injuries he sustained on February 2, 2012 and the treatment he has received and will receive for those injuries, Mr. Koch will never work again.[7]

58. Mr. Koch is but a shell of the man he once was.

59. Prior to February 2, 2012, and despite multiple pre-existing injuries,[8] Mr. Koch was an active, convivial man who enjoyed going to work.  Although he frequently experienced pain while working, particularly in his knees, Mr. Koch performed his work activities with vigor and without restriction since at least 2010.

60. Mr. Koch was equally active at home.  He mowed the lawn.  He fixed the plumbing.  He updated the kitchen cabinets.  He removed the bedroom ceiling and then re-installed it.  He even undertook to modify the drainage system in his home, which involved digging up the bulkhead, replacing existing pipe, and placing gravel rocks on top of the drain pipe.

61. Mr. Koch's life has changed dramatically since the accident.

62. Mr. Koch has not returned to work.

63. A typical day begins with Mr. Koch waking up on a recliner after three or four hours of restless sleep.[9]  Mr. Koch rarely moves from the recliner.  He watches television but that gets boring.  He attempts to do crossword puzzles but eventually succumbs to the pain in his hands and is forced to stop.  He attempts to help with chores around the house, *e.g.*, unloading the dishwasher, folding

---

[7] This finding is based on the credible testimony of Mr. Koch and Dr. Miranne.
[8] Mr. Koch had two open surgeries on his right knee, two arthroscopic procedures on his left knee, an ACDF at C3-4 and C4-5, and ganglion cysts in both wrists.
[9] Mrs. Koch explained that sleeping on a normal bed is too painful for her husband.

clothes, and vacuuming the floors, but even these simple tasks often prove too much for his aching body.

64. When Mrs. Koch arrives home from a full day of work, she usually finds her husband prone on the recliner.  Prior to the accident, the couple had an active social life.  As a result of the accident, that social life has vanished.  Caregiving is now the primary component of the Kochs' relationship.  Mrs. Koch does the work around the house Mr. Koch once loved to do, drives Mr. Koch to his doctor appointments, and generally attends to her husband's well-being.  The stress of working a full-time job and taking care of her husband has taken its toll on Mrs. Koch.  This stress has adversely affected the marital relationship.

65. Mr. Koch can no longer be considered a happy man.  He often tells his wife that life is no longer worth living.  As Mr. Koch poignantly testified on direct examination: "I guess you call it living.  I call it just existing."

## CONCLUSIONS OF LAW

1. Mr. and Mrs. Koch have sued the United States.  The United States is immune from suit absent a waiver of sovereign immunity.[10]  The United States has waived sovereign immunity to admiralty suits through two different statutes: the Public Vessels Act ("PVA")[11] and the Suits in Admiralty Act ("SAA").[12]  The PVA allows suits for "damages caused by a public vessel of the United States."[13]  The SAA waives sovereign immunity for "case[s] in which, if a vessel were privately owned or operated . . . a civil action in admiralty could be maintained."[14]  In light of the

---

[10] *United States v. Bormes*, 122 S. Ct. 12, 16 (2012).
[11] 46 U.S.C. § 31101 *et seq.*
[12] 46 U.S.C. § 30901 *et seq.*
[13] 46 U.S.C. § 31102(a)(1).
[14] 46 U.S.C. § 30903(a).

overlap between the two statutes,[15] the question arises whether the Kochs' claims against the United States are governed by the PVA or alternatively by the SAA.[16]

2. In *United States v. United Continental Tuna*, the Supreme Court held that when a claim falls under both the PVA and the SAA, the PVA controls.[17]  Thus, if the Kochs' claims are cognizable under the PVA, this statute applies to the exclusion of the SAA.

3. The Supreme Court interpreted the reach of the PVA in two seminal cases in the 1940s.  In *Canadian Aviator v. United States*, the Court held the PVA is not restricted to collision cases but instead extends "to cases where the negligence of the personnel of a public vessel in the operation of the vessel causes damage to other ships, their cargoes, and personnel."[18]  Two years later, in *American Stevedores v. Porello*, the Court further extended the PVA to include a claim by a longshoreman for personal injury suffered aboard a public vessel—the same claim asserted by Mr. Koch.[19]

4. The Kochs' claims are governed by the PVA.

---

[15] For an explanation of the "curious historical analomy" that led to the overlap between the PVA and the SAA, *see* 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 20-1 (5th ed. 2014).

[16] Resolving this question is more than an academic exercise, as the PVA and SAA differ on issues of venue, pre-judgment interest, and suit by foreign nationals.  *See id.*

[17] *See* 425 U.S. 164, 181 (1976); *accord Wade v. Bordelon Marine, Inc.*, 770 F. Supp. 2d 822, 825 (E.D. La. 2011) ("[I]f a claim is subject to the PVA, a plaintiff cannot avoid the requirements of the PVA simply by arguing that the SAA independently waives immunity to that same claim.").

[18] 324 U.S. 215, 224–25 (1945).

[19] 330 U.S. 446, 454 (1947); *see also Marine Coatings of Ala. v. United States*, 71 F.3d 1558, 1562 (11th Cir. 1996) (noting that in *Porello*, "the Court held that the Public Vessels Act should not be read only to provide a remedy to the owners of damaged property, and expanded its coverage to include a claim for personal injuries suffered by a longshoreman aboard a public vessel.") (internal quotation marks omitted).

5. A civil action under the PVA must be brought in the judicial district in which the public vessel is located.[20]   The S.S. ALTAIR is located in the Eastern District of Louisiana.

6. Venue is proper in this Court.

## I. Liability

7. Under the PVA, the United States is liable for its negligent conduct to the same extent as a private person.[21]   Accordingly, the general maritime law provides the applicable substantive law.[22]   The elements of a maritime negligence action are well known.   In order to establish liability, a plaintiff must demonstrate the following: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; (3) the plaintiff suffered injury; and (4) the defendant's breach of duty caused the plaintiff's injury.[23]

8. A vessel owner owes a longshoreman lawfully aboard the vessel three distinct duties:[24] the "turnover duty," the "active control duty," and the "duty to intervene."[25]   The parties agree only the "active control duty" is implicated by this case.[26]

9. A shipowner is required to "exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.'"[27]   The

---

[20] *See* 46 U.S.C. § 31104(a).

[21] 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 20-1 (5th ed. 2014)

[22] *Id.*

[23] *See In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010).

[24] Mr. Koch has sued the United States under Section 905(b) of LHWCA, which allows a longshoreman to bring a negligence action against the owner of the vessel on which he was injured.  The parties agree Section 905(b) governs Mr. Koch's negligence action.

[25] *See Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98 (1994).

[26] *See generally* R. Docs. 125, 126.

[27] *Howlett*, 512 U.S. at 98 (quoting *Scindia Steam Navigation Co., Ltd., v. De Los Santos*, 451 U.S. 156, 167 (1981)).

Fifth Circuit has likened "active control" to "operational control."[28]   Liability based on breach of the active control duty is not relieved when the hazard is open and obvious.[29]

10. It is undisputed the United States—through its agent Tote—maintained operational control over the Winch Room.  It is also undisputed the lights above the stairwell to the Winch Room did not fully illuminate.  Despite this lack of adequate lighting, the Chief Engineer of the S.S. BELLATRIX led Mr. Koch and the other contractors down a stairwell that became progressively darker with each step.

11. The United States failed to exercise reasonable care to prevent injuries in the Winch Room, thereby breaching a duty owed to Mr. Koch.[30]

12. Because Mr. Koch undoubtedly suffered personal injury, the remaining question is whether the negligence of the United States caused his injuries.

13. In order to prevail, Mr. Koch must demonstrate the United States' negligence was the "legal cause" of his injuries.[31]   This is a higher standard than "but-for" causation.[32]   "[T]he negligence must be a 'substantial factor' in the injury."[33]

---

[28] *See Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997); *accord Fontenot v. McCall's Boat Rentals, Inc.*, 227 F. App'x 397, 403 (5th Cir. 2007) ("This court has described active control within the meaning of *Scindia* as instead being akin to operational control at the time of the activities in question.").

[29] *Pimental v. LTD Canadian Pac. Bul.*, 965 F.2d 13, 16 (5th Cir. 1992).

[30] Some district courts have noted "that a vessel owner has no duty to provide adequate lighting for longshoreman." *See Bias v. Hanjin Shipping Co. Ltd.*, No. G-07-0338, 2009 WL 746051, at *5 (S.D. Tex. Mar. 18, 2009) (collecting cases).  In those cases, however, the vessel owner did not maintain active control over the area where the longshoreman was injured. *See id.* at *6.  *But see Wright v. Gulf Coast Dockside, Inc.*, No. Civ. A. 97-2745, 1998 WL 334851, at *3–4 (E.D. La. June 23, 2008).  The instant case is distinguishable, because the United States maintained active control over the Winch Room.  The Fifth Circuit has found a breach of the active control duty in similar circumstances. *See Masinter v. Tenneco Oil Co.*, 867 F.2d 892, 897–99 (5th Cir. 1989); *accord Bias*, 2009 WL 746051, at *6 n.36.

[31] *In re Great Lakes*, 624 F.3d at 213–14.

[32] *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992).

[33] *Thomas v. Express Boat Co., Inc.*, 759 F.2d 444, 448 (5th Cir. 1985) (quoting *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 223 (5th Cir. 1975)).

14. The United States argues Mr. Koch cannot establish causation for two reasons. First, all of his injuries resulted from pre-existing conditions.

15. When a plaintiff has pre-existing injuries, a defendant is not liable for any injuries the plaintiff would have suffered even if the second accident had not occurred.[34]

16. Although the plaintiff bears the ultimate burden of establishing causation, the defendant bears the burden of proving "the extent of the damages that the preexisting condition would inevitably have caused."[35]

17. The evidence presented at trial does not establish that any of the injuries of which Mr. Koch complains were inevitable.  Despite awareness of his pre-existing conditions, both of Mr. Koch's treating physicians causally attribute his injuries to the accident aboard the S.S. BELLATRIX.  The trial testimony of Mr. and Mrs. Koch is consistent with these opinions.[36]

18. The only evidence presented by the United States in rebuttal was the trial testimony of Dr. Hagemann.  For the reasons previously explained, the Court finds Dr. Hagemann's medical opinions are entitled to little weight.

19. The United States has failed to carry its burden of establishing Mr. Koch's damages were caused by pre-existing conditions.

20. The United States' second argument against causation is that Mr. Koch's carpal tunnel injuries were caused by the ACDF at C5-6 and 6-7, not the accident that

---

[34] 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5-16 (5th ed. 2014)
[35] *Maurer v. United States*, 668 F.2d 98, 100 (2d Cir. 1981).  Both parties cite this case in their trial memoranda.
[36] Prior to the accident, Mr. Koch led an active life.  He had no plans for future surgeries.

occurred on the S.S. BELLATRIX.[37]   In other words, the United States argues the ACDF was a superseding cause.

21. The doctrine of superseding cause is applied in maritime cases "where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable."[38]   A negligent defendant is not liable for injuries stemming from a superseding cause.[39]

22. The ACDF at C5-6 and 6-7 was not a superseding cause of Mr. Koch's carpal tunnel injuries.   Even if the carpal tunnel injuries were not directly caused by the accident aboard the S.S. BELLATRIX, it was reasonably foreseeable that Mr. Koch would experience complications from a surgery necessitated by the accident.[40]

23. Mr. Koch has demonstrated by a preponderance of the evidence that the United States' negligence was the legal cause of his injuries.

## II. Comparative Negligence

24. In a Section 905(b) action, the doctrine of comparative negligence bars a plaintiff from recovering damages sustained as a result of his own fault.[41]   A longshoreman is negligent when he fails to use reasonable care under the

---

[37] The United States buried this argument in its post-trial memorandum.  *See* R. Doc. 116, p. 22.

[38] *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837–38 (1996) (quoting 1 T. Schoenbaum, *Admiralty and Maritime Law* § 5–3, p. 165–66 (2d ed. 1994)).

[39] *See Sofec*, 517 U.S. at 837.

[40] To the extent the United States also argues the need for posterior decompression and lateral fusion was caused by the ACDF at C5-6 and 6-7, that argument fails for the same reasons.

[41] *See Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 536 (5th Cir. 1986).

circumstances.[42]    The vessel owner bears the burden of proving the longshoreman's negligence.[43]

25. Using both hands to hold the handrails was reasonable.

26. Mr. Koch acted with reasonable care under the circumstances.

27. The United States has failed to prove Mr. Koch was comparatively negligent.

## III.  Damages

28. An injured longshoreman may recover the following damages from a negligent vessel owner: past and future medical expenses, past and future loss of earning capacity and wages, and pain and suffering.[44] A loss of consortium award is permissible in a Section 905(b) action where, as here, the injury occurs in territorial waters.[45]

### A.  Medical Expenses

29. Pursuant to a policy of workers' compensation coverage with Economy Iron, AIIC has paid Mr. Koch's medical expenses.   As of the date of trial, AIIC paid $120,145.56 in medical benefits.   This figure represents a discount from the amounts actually billed by Mr. Koch's medical providers.[46]   Citing the collateral source rule, Mr. Koch contends the proper measure of past medical expenses is the amount billed by his providers, not the amount ultimately paid by AAIC.   The Court disagrees.

---

[42] *Colomb v. Texaco, Inc.*, 736 F.2d 218, 221 (5th Cir. 1984).
[43] *See Miles v. Melrose*, 882 F.2d 976, 984 (5th Cir. 1989).
[44] *Landry v. G.C. Constructors*, 802 F. Supp. 2d 827, 833 (S.D. Miss. 2011); *Baham v. Nabors Drilling USA, LP*, 721 F. Supp. 2d 499, 515 (W.D. La. 2010).
[45] *Moore v. M/V Angela*, 353 F.3d 376, 383 (5th Cir. 2003); *Nichols v. Petroleum Helicopters, Inc.*, 17 F.3d 119, 123 (5th Cir. 1994).
[46] *See* R. Doc. 115, p. 6; R. Doc. 116, p. 36.  As the parties explain in their memoranda, Mr. Koch's medical providers charged AIIC at a discounted rate.

30. In support of his argument, Mr. Koch relies solely on the following footnote in *Phillips v. Western Co. of North America*: "Workers' compensation benefits usually derive from a source collateral to the tortfeasor . . . . Although many workers' compensation statutes enable the employer to recover the amounts they pay by subrogating the employer to the worker's claim . . . this does not reduce the total amount of damages paid by the tortfeasor."[47]

31. This excerpt does not stand for the proposition for which it is cited.

32. The quoted language merely explains that a tortfeasor may not set off against its total liability any workers' compensation payments an injured worker receives from a third party. *Phillips* did not purport to address the proper measure of past medical expenses when the compensation carrier pays those expenses at a discounted rate.

33. The Court finds the amounts paid by AIIC—rather than some hypothetical amount Mr. Koch (or some other party) might have paid had AIIC not made prior arrangements—is the proper measure of Mr. Koch's past medical expenses.[48]

34. Mr. Koch is entitled to past medical expenses in the amount of $120,145.56.

35. Mr. Koch has established by a preponderance of the evidence he will undergo the following surgical procedures as a result of the accident on February 2, 2012: left knee replacement, revision surgery for both knees, posterior decompression and

---

[47] 953 F.2d 923, 931 n.9 (5th Cir. 1992).

[48] A federal district court in Oregon confronted a similar issue. *See Tucker v. Cascade Gen., Inc.*, No. 3:09-CV-1491-AC, 2014 WL 6085829 (D. Or. Nov. 13, 2014). In *Tucker*, the plaintiff-longshoreman was injured aboard a public vessel and brought a 905(b) action against the United States. *Id.* at *1. The plaintiff sought past medical expenses in the amounts billed, prior to any adjustments by the medical provider. *Id.* at *27. The United States objected, arguing the amount billed is not grounded in actual costs and therefore is not the appropriate measure of past medical expenses. *Id.* The court agreed with the United States: "Unlike future costs, a calculation of agreed-upon past expenses can be readily calculated. It is unreasonable to seek reimbursement for amounts that were never paid. Rather, in this court's view, an award for past medical expenses *based upon the actual amount expended* is appropriate." *Id.* (emphasis added).

lateral fusion at C5-6 and C6-7, and left carpal tunnel release. Mr. Koch will also incur costs associated with prescription medication, physician visits, specialist visits, and physical therapy.

36. Mr. Koch's right knee replacement cost $72,586.14. Dr. Finger testified this is a reasonable estimate regarding the cost of left knee replacement.

37. Mr. Koch will incur $72,586.14 in expenses for left knee replacement.

38. Estimating the future cost of the revision surgeries is a more difficult task. Dr. Finger testified in his deposition "with complete certainty" that the revision surgeries will be more expensive than the initial replacement surgeries. Despite this certainty, Dr. Finger could not provide a specific estimate of cost.[49]

39. The Court finds that $85,000 is a reasonable estimate for each revision surgery.

40. Mr. Koch will incur a total of $170,000 in expenses for revision surgery on his left and right knees.

41. Mr. Koch will incur $86,230 in expenses for his posterior decompression and lateral fusion at C5-6 and C6-7, which breaks down as follows: $5000 in anesthesia costs,[50] $47,000 in hospital costs,[51] and $34,230 in surgery costs.[52]

---

[49] Dr. Finger testified that recovery from a revision surgery typically requires a hospital stay one-and-half-times longer than recovery from the initial replacement surgery. Citing solely this testimony, Mr. Koch argues the cost of revision surgery should be calculated by multiplying the cost of the initial replacement surgery by 1.5. *See* R. Doc. 115, p. 11 n.6. The Court finds this methodology of estimating costs unsupported by the medical evidence and too speculative to warrant serious consideration.

[50] Trial Ex. 28.

[51] Trial Ex. 29.

[52] Trial Ex. 30. Mr. Koch argues the estimate of $86,230 should be increased, because it "does not account for anticipated product and device charges." *See* R. Doc. 115, p. 11–12, n.9. Mr. Koch contends a more accurate measure of the costs associated with posterior decompression and lateral fusion is the cost of the August 17, 2012 ACDF. The Court disagrees. As a preliminary matter, none of the exhibits from which the $86,230 estimate is derived explicitly state that "product and device charges" *are not* included. Second, and more importantly, if Mr. Koch wishes to include these charges as damages, it was his burden to obtain a reliable estimate. Without more, merely pointing to the cost of a different surgery (the August 2012 ACDF) falls well short of carrying this burden.

42. Mr. Koch's right carpal tunnel release cost $14,319.79.  It is reasonable to conclude the left carpal tunnel release will cost the same amount.

43. Mr. Koch will incur $14,319.79 in expenses for his left carpal tunnal release.

44. Mr. Koch will incur a total of $132,129.60 in expenses for prescription medication, physician visits, specialist visits, and physical therapy.[53]

45. In sum, Mr. Koch will incur $475,265.53 in future medical expenses.[54]

46. As with most future sources of income, a damage award for future medical expenses must be discounted to present value.[55]  Mr. Koch seeks to avoid this well-established rule by citing *Baham*—a district court decision from the Western District of Louisiana.[56]  In that case, the court declined to discount the plaintiff's future medical expenses to present value, because it "accept[ed] the testimony of plaintiff's economic expert . . . that the medical inflation rate and the discount rate offset each other."[57]  There has been no such expert testimony in this case. Thus, *Baham* is clearly inapposite.

47. Mr. Koch's future medical expenses must be discounted to present value.

---

[53] These figures are derived from a Medicare Set Aside ("MSA").  *See* Trial Ex. 101.  In a LHWCA case, an MSA estimates future medical expenses using discounted longshore rates "despite no guarantee [the injured longshoreman] will receive those rates."  *Tucker*, 2014 WL 6085829, at *28.  For this reason, an MSA tends to underestimate costs.  *See id.*  Nonetheless, as Mr. Koch concedes in his memorandum, the MSA is the best (and only) estimate in this case of the costs associated with prescription drugs, physical visits, specialist visits, and physical therapy.  *See* R. Doc. 115, p. 12.

[54] This figure breaks down as follows: $72,586.14 (left knee replacement) + $170,000 (revision surgeries) + $86,230 (posterior decompression and lateral fusion) + $14,319.79 (right carpal tunnal release) + $132,129.60 (future medical care) = $475,265.53.

[55] *See* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5-16 (5th ed. 2014) ("Future medical expenses are . . . subject to discounting to present value."); *Ammar v. United States*, 342 F.3d 133, 137 (2d Cir. 2003) ("It is established that an award of damages to compensate for losses of future income *or for anticipated future expenditures* must be adjusted to take into account the earning power of money over a period of time.") (emphasis added); *Ledet v. Smith Marine Towing Corp.*, No. 10-1713, 2011 WL 1303918, at *15 (E.D. La. Apr. 4, 2011) (discounting future medical expenses to present value in maritime case); *Harrison v. Diamond Offshore Drilling, Inc.*, No. 07-417, 2008 WL 708076, at *21 (E.D. La. Mar. 6, 2008) (same).

[56] *See* R. Doc. 91, p. 18.

[57] *Baham*, 721 F. Supp. 2d at 518.

48. The parties shall submit proposed calculations regarding the present value of Mr. Koch's future medical expenses within two weeks.[58]

### B. Lost Wages

49. Mr. Koch is entitled to any wages he would have earned had he continued to work in his prior capacity through the date of trial, less (1) any wages Economy Iron actually paid him, and (2) any wages he could have earned despite his physical condition.[59]  Mr. Koch is also entitled to future lost wages, which are determined by "estimating the loss of work life resulting from the injury . . . , calculating the lost income stream, computing the total damage, and discounting that amount to its present value."[60]

50. The parties both elicited expert testimony on lost wages.  Mr. Koch offered the expert testimony of Harold Asher; the United States offered the expert testimony of John Wills.

51. Asher and Wills are substantially in agreement regarding the amount of Mr. Koch's past lost wages.  Asher calculates a past wage loss of $215,628, while Wills calculates a past wage loss of $215,238.

52. Unlike past wage loss, the experts disagree over Mr. Koch's future wage loss. Assuming Mr. Koch can never work again,[61] Asher calculates a future wage loss of $600,443, while Wills calculates a future wage loss of $572,688.  The differences in these figures stem primarily from the applicable tax rate and discount rate.

---

[58] The calculations may be jointly submitted, if agreed upon.
[59] *See Ledet*, 2011 WL 1303918, at *12.
[60] *Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir. 1983) (en banc).
[61] Wills also submitted a separate calculation under the assumption that Mr. Koch can return to work. Because the Court has determined Mr. Koch cannot return to work, this calculation is irrelevant.

53. With respect to the former, Asher assumed Mr. and Mrs. Koch will file their tax returns separately despite the fact their previous returns were filed jointly.  Wills, on the other hand, assumed the couple would continue to file joint returns.

54. There is no evidence the Kochs intend to file future tax returns separately. Accordingly, it was more reasonable to assume they would continue to file joint returns.

55. The Court finds Wills selected the more appropriate tax rate of 15.73%.

56. The experts also disagreed regarding the appropriate discount rate to be applied to Mr. Koch's future wage loss.  Asher applied a discount rate of 0.35%.  Both of these discounts rates are reasonable.

57. The Court accepts Wills's discount rate.

58. The appropriate discount rate is 0.51%.

59. Having resolved the two primary discrepancies regarding wage calculations in favor of Wills, the Court accepts Wills's calculations of past and future wage loss.

60. Mr. Koch is entitled to an award of $215,238 for past wage loss.

61. Mr. Koch is entitled to an award of $572,688 for future wage loss.

### C.  Pain and Suffering

62. As set forth more fully above, Mr. Koch has endured and will continue to endure substantial pain and suffering as a result of his injuries.

63. To compensate him for this pain and suffering, Mr. Koch is entitled to an award of $1,300,000.

### D.  Loss of Consortium

64. As set forth more fully above, Mr. Koch's injuries have adversely impacted the marital relationship.

65. Mrs. Koch is entitled to recover $150,000 for loss of consortium.

## IV.  Interest on Damages and Costs

66. This action is governed by the PVA, which precludes an award of pre-judgment interest and costs.[62]

67. Plaintiffs are not entitled to pre-judgment interest or costs.

68. Post-judgment interest will accrue at the federal rate.

## V.  AIIC's Lien

69. As Economy Iron's workers' compensation carrier, AIIC has paid compensation benefits to Mr. Koch.

70. Although the LHWCA does not expressly allow it, the case law allows a compensation carrier to assert a lien on the injured longshoreman's recovery to the extent of any benefits paid.[63]

71. AIIC has a valid, enforceable lien on Mr. Koch's damage award for the full amount of compensation benefits already paid, which includes at least $160,471.17 in indemnity benefits and $120,145.56 in medical benefits.

## CONCLUSION

On the basis of the foregoing findings of fact and conclusions of law, the Court finds that Mr. Koch and Mrs. Koch have suffered the following damages due to the negligence of the United States:

Mr. Koch

A.  Past Medical Expenses                    $120,145.56

B.  Future Medical Expenses                  $475,265.53
                                             (to be discounted to future value)

---

[62] 46 U.S.C. § 31107.
[63] *Masinter*, 867 F.2d at 900; *see also Peters v. N. River Ins. Co. of Morristown, N.J.*, 764 F.2d 306, 312 (5th Cir. 1985).

|   |   |
|---|---|
| C.  Past Lost Wages | $215,238.00 |
| D.  Future Lost Wages | $572,688.00 |
| E.  Pain and Suffering | $1,300,000.00 |

Mrs. Koch

|   |   |
|---|---|
| A.  Loss of Consortium | $150,000.00 |

AIIC has a lien on the judgment to the extent of compensation benefits already paid. Plaintiffs may not recover pre-judgment interest or costs.  Post-judgment interest will accrue at the federal rate.

**New Orleans, Louisiana, this 7th day of July, 2015.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**